**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| BRANDON JACKSON, derivatively on behalf of AEROVIRONMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> WAHID NAWABI, HENRY ALBERS, CHARLES THOMAS BURBAGE, PHILIP S. DAVIDSON, CINDY K. LEWIS, MARY BETH LONG, EDWARD R. MULLER, STEPHEN F. PAGE, JOSEPH L. VOTEL, DAVID WODLINGER, KEVIN P. MCDONNELL, and MARY CLUM, <br><br> Defendants, <br><br> -and- <br><br> AEROVIRONMENT, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Brandon Jackson ("Plaintiff"), derivatively on behalf of AeroVironment, Inc. ("AeroVironment" or the "Company"), brings this complaint against the Company's board of directors (the "Board") and certain executive officers for breaches of fiduciary duty and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in this Complaint are based upon information and belief, including: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in Norell v. AeroVironment, Inc., No. 1:26-cv-01429 (E.D. Va.), and City Pension Fund for Firefighters and

1

Police Officers in the City of Miami Beach v. AeroVironment, Inc., et al., No. 1:26-cv-00875 (D. Del.) (collectively, the "Securities Class Actions"); (iii) corporate-governance documents available on the Company's website; and (iv) other publicly available information.

**NATURE OF THE ACTION**

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of AeroVironment, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least June 24, 2025, through June 22, 2026 (the "Relevant Time Period"). During that time, Defendants caused or allowed AeroVironment to issue materially false and misleading statements concerning the Company's financial condition and business operations.

2. AeroVironment is a defense technology company. Shortly before the commencement of the Relevant Time Period, AeroVironment completed its acquisition of BlueHalo, LLC ("BlueHalo"), a defense technology company whose principal assets and capabilities included a leading role in the U.S. Department of Defense's ("DoD") Satellite Communications Augmentation Resource ("SCAR") program. In connection with the SCAR program, BlueHalo had received a contract valued at approximately $1.7 billion to develop military satellite command-and-control stations known as Broad Area Deployable Ground Terminal Enabling Resilient Communications systems ("BADGERs").

3. During the Relevant Time Period, Defendants repeatedly promoted the SCAR program and AeroVironment's anticipated production of BADGER systems as significant drivers of the Company's future growth. Among other things, Defendants represented to investors that AeroVironment had "won" the SCAR contract, that the program was "locked in," that the customer

2

was "asking for more," and that the Company was "very much on track" to increase revenues and improve margins as additional BADGER systems entered production.

4.    These representations regarding the status, security, and expected value of the SCAR agreement were materially false and misleading. In reality, AeroVironment's agreement with the DoD to produce BADGER systems was not secure. The Company faced a substantial risk that other vendors would be permitted to compete for the work, and there was a material possibility that AeroVironment would either cease delivering products under the SCAR program or would participate in the program on a substantially reduced basis.

5.    The concealed problems concerning the SCAR program began to be disclosed on January 20, 2026, when AeroVironment announced that the U.S. Government had issued a stop-work order concerning the Company's agreement to deliver BADGER systems in support of the program. Following this announcement, AeroVironment's common stock declined by $61.97 per share, or approximately 16%.

6.    Additional information emerged on March 2, 2026, when the industry publication Space News reported that the DoD was reopening the SCAR program and seeking proposals from vendors other than AeroVironment because the Space Force was "reassessing how to move forward." Following the publication of that report, AeroVironment's common stock declined by $43.93 per share, or approximately 17%. Despite this disclosure, Defendants continued to minimize the competitive threat to AeroVironment's position under the SCAR program and the corresponding risk that the Company's anticipated revenues from the program would be materially reduced.

7.    On March 10, 2026, after the close of trading, AeroVironment disclosed that the U.S. Government had informed the Company of its intention to terminate the existing SCAR

agreement, while permitting AeroVironment to compete for future work under the program. AeroVironment also recorded a $151.3 million goodwill impairment charge relating to its Space reporting unit, which the Company attributed to the SCAR stop-work order. Following these disclosures, AeroVironment's common stock declined by $13.84 per share, or approximately 6%.

8. On June 22, 2026, AeroVironment disclosed that investors should no longer rely upon certain of the Company's previously issued financial statements because AeroVironment had understated the goodwill impairment charge by $89.4 million, or approximately 59%. The Company further acknowledged that the required restatement resulted from a newly identified material weakness in its internal control over financial reporting and that its disclosure controls and procedures were ineffective as of January 31, 2026. Following these disclosures, AeroVironment's common stock declined by $18.28 per share, or approximately 11%.

9. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

10. Plaintiff Brandon Jackson is a current stockholder of AeroVironment, continuously held AeroVironment common stock throughout the Relevant Time Period, and continues to hold AeroVironment stock. Plaintiff will adequately and fairly represent the interests of AeroVironment and its stockholders in enforcing the Company's rights.

### B. Nominal Defendant

11. Nominal Defendant AeroVironment is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 241

18th Street South, Suite 650, Arlington, Virginia 22202. AeroVironment common stock trades on the Nasdaq Global Select Market under the ticker symbol "AVAV."

### C. Individual Defendants

12. Defendant Wahid Nawabi has served as the Company's President and CEO since 2016, a director of the Company since 2016, and as Chairman of the Board since 2021.

13. Defendant Edward R. Muller has been a director of the Company since 2013.

14. Defendant Charles Thomas Burbage has been a director of the Company since 2013.

15. Defendant Stephen F. Page has been a director of the Company since 2013.

16. Defendant Cindy K. Lewis has been a director of the Company since 2021.

17. Defendant Philip S. Davidson has been a director of the Company since 2023.

18. Defendant Mary Beth Long has been a director of the Company since 2023.

19. Defendant Joseph L. Votel has been a director of the Company since 2023.

20. Defendant David Wodlinger served as a director of the Company from May 1, 2025, through June 17, 2026.

21. Defendant Henry Albers served as a director of the Company from May 1, 2025, through June 17, 2026.

22. William J. Lynn III has served as a director of the Company since June 24, 2026. Lynn is not named as a defendant in this action.

23. Defendants Nawabi, Muller, Burbage, Page, Lewis, Davidson, Long, Votel, Wodlinger, and Albers are referred to herein collectively as the "Director Defendants."

24. Defendant Kevin P. McDonnell served as the Company's Chief Financial Officer ("CFO") from 2020 through April 30, 2026. McDonnell also served as the Company's Senior Vice

5

President ("SVP") from 2020 until March 2025 and thereafter as Executive Vice President ("EVP") from May 2025 until April 2026. As of the filing of this Complaint, McDonnell is expected to remain employed by the Company in a non-officer advisory capacity through July 31, 2026.

25.     Defendant Mary Clum has served as President of the Company's Space, Cyber & Directed Energy business segment since October 2025. Clum joined AeroVironment in May 2025 through the Company's acquisition of BlueHalo, where she had served as President of the Product & Space Systems portfolio.

26.     Defendants Nawabi, McDonnell, and Clum are referred to herein collectively as the "Officer Defendants."

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     Personal jurisdiction exists over the Director Defendants under 10 Del. C. § 3114(a) because, by accepting and serving in their positions as directors of a Delaware corporation, they consented to service of process in Delaware in actions alleging violations of their duties in those capacities. Personal jurisdiction exists over Defendants Nawabi and McDonnell under 10 Del. C. § 3114(b) as qualifying officers of a Delaware corporation. Personal jurisdiction also exists to the extent authorized by the nationwide-service provision of Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and under principles of pendent personal jurisdiction for claims arising from the same nucleus of operative facts.

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. AeroVironment is incorporated in Delaware and is therefore an inhabitant of this District. This action concerns the internal affairs of a Delaware corporation and alleged violations of duties owed by its directors and officers in those capacities.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

31.     AeroVironment is a defense technology company that develops capabilities and systems for use across the air, land, maritime, space, and cyber domains. A substantial portion of the Company's products and technologies are developed and manufactured for the U.S. Department of Defense ("DoD") and allied foreign governments pursuant to various government contracts.

32.     On May 1, 2025, AeroVironment completed its acquisition of BlueHalo in an all-stock transaction valued at approximately $4.1 billion. BlueHalo was likewise a defense technology company, with operations focused principally on counter-unmanned aircraft systems ("counter-UAS"), unmanned maritime systems, space technologies, electronic warfare, and cyber markets.

33.     A significant component of BlueHalo's value was its leading role in the DoD's Satellite Communications Augmentation Resource ("SCAR") program, which was launched in 2022 to reduce the burden on the U.S. Space Force's aging Satellite Control Network. In connection with the SCAR program, BlueHalo had received a $1.4 billion no-bid contract from the DoD to develop a series of military satellite command-and-control stations known as Broad

Area Deployable Ground Terminal Enabling Resilient Communications systems ("BADGERs"). Before the commencement of the Relevant Time Period, the value of that contract increased by approximately $300 million, bringing its total value to approximately $1.7 billion.

**B.      AeroVironment's False and Misleading Statements**

34.      On June 24, 2025, following the close of trading, AeroVironment conducted its earnings call concerning its financial results for the fourth quarter of fiscal year 2025. During that call, Defendant Nawabi represented that "recently the U.S. Department of Defense reiterated the importance our solutions and capabilities play in national defense strategy from precision fires and loitering munitions, autonomous counter UAS and to space technologies, cybersecurity solutions, and advanced munitions." Nawabi further stated that the Company was "positioned very, very well in" several areas, including "space communications."

35.      During the same earnings call, Nawabi identified the SCAR program as one of the "several very serious large growth potential opportunities in front of us." Nawabi further represented that AeroVironment had "won" the SCAR contract, stating: "It's worth about a $1.7 billion program funded through the Congressional budget documents. We can scale that and expedite deliveries in the fiscal year 2026 and beyond."

36.      Also, during the June 24, 2025, earnings call, Defendant McDonnell represented that "[o]ur visibility to the midpoint of the revenue guidance range is at 70%," and confirmed that this figure included the operations acquired through BlueHalo.

37.      On September 9, 2025, AeroVironment conducted a conference call with analysts to discuss the Company's financial results and operations for the first quarter of fiscal year 2026. During that call, Nawabi stated that "we're confident that our BADGER phased array solution" would "be [a] key growth driver[] for the segment in the future."

38.     On September 30, 2025, AeroVironment held an Investor Open House at its Space and Directed Energy facility in Albuquerque, New Mexico, where the Company manufactured its BADGER systems. During the event, Nawabi emphasized the importance of the SCAR program to AeroVironment's business, stating that "SCAR and our BADGER space comms is really key. That's a $1 billion franchise."

39.     During the same Investor Open House, Defendant Clum characterized SCAR as a "program win" and represented that "[i]t's an awarded value of $1.7 billion, extending all the way through . . . 2030." Clum further stated that AeroVironment's SCAR "solution" was "in very high demand with the Space Force," and explained: "[w]e put our entire team shoulder to shoulder with the customer. We listen, we adapt and we designed with them."

40.     Clum additionally represented that "SCAR's a program locked in, in a very high barrier to entry market," and stated that "the customer is asking for more. We're ready to build more."

41.     On December 3, 2025, during a question-and-answer session at the Goldman Sachs Industrials and Materials Conference, Nawabi identified the SCAR program as one of the opportunities "that's going to contribute to the growth" of AeroVironment over the following several years. Nawabi further stated: "[t]hat's a program that we've won. It's $1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays."

42.     On December 9, 2025, AeroVironment announced its financial results for the second quarter of fiscal year 2026 and conducted a related earnings call. During the call, Nawabi stated that AeroVironment had "secured a new firm fixed price option for two BADGER Phased Array Systems under the SCAR" program and represented that the SCAR "program represents a

tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production."

43.    Nawabi further stated that AeroVironment was "shifting now from development activity to delivering products" under the SCAR program, which he represented would "not only ramp[] up the revenue for the second half of the year, but also improve[] the margin profile of that business."

44.    Nawabi also assured investors that "we're very much on track with our plans" concerning the SCAR program. He further stated: "[w]e're pleased with the performance so far, and we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year."

45.    The foregoing statements were materially false and misleading when made because they misrepresented and failed to disclose the actual status and security of AeroVironment's agreement with the DoD to produce BADGER systems under the SCAR program. In reality, the agreement was not secure, AeroVironment faced a substantial threat that other vendors would be permitted to compete for the work, and there was a material risk that the Company would lose all or a significant portion of the anticipated revenues associated with the program.

### C.    The Truth is Revealed

46.    On January 20, 2026, AeroVironment announced that the U.S. Government had issued a stop-work order concerning the Company's agreement to deliver BADGER systems in support of the SCAR program. The Company characterized the stop-work order as having been issued "upon mutual agreement" with AeroVironment. Following this disclosure, the price of AeroVironment common stock declined by $61.97 per share, or approximately 16%, falling from

a closing price of $392.86 per share on January 16, 2026, to $330.89 per share on January 20, 2026.

47. Despite the issuance of the stop-work order, AeroVironment continued to provide investors with assurances concerning the future of the SCAR program. In its January 20, 2026, announcement, the Company stated that the "stop work order allows for the parties to negotiate an amended agreement for the future of the SCAR program" and represented that the "Company expects to continue to deliver capabilities and products for the SCAR program."

48. These statements were materially false and misleading because they failed to disclose the substantial risk that AeroVironment would not continue delivering products under the SCAR program or would be permitted to do so only on a materially reduced basis. In reality, AeroVironment faced a significant threat that other vendors would be permitted to compete for the work previously expected to be performed by the Company.

49. On March 2, 2026, the industry publication Space News reported that the DoD was reopening the SCAR program and soliciting proposals from vendors other than AeroVironment because the Space Force was "reassessing how to move forward." The article quoted Colonel Owen Stevens, Director of Contracting at the Space Rapid Capabilities Office, as stating: "We have been in conversations with the SAE [senior acquisition executive] for a little while now, and we are going to move into a new acquisition strategy for SCAR."

50. Colonel Stevens further stated that the new acquisition strategy "will likely take the form of other companies building versions or variants of SCAR," and that the Space Force "will likely introduce other vendors into the mix." Following the publication of this information, the price of AeroVironment common stock declined by $43.93 per share, or approximately 17%,

11

falling from a closing price of $252.25 per share on February 27, 2026, to $208.32 per share on March 2, 2026.

51.     Notwithstanding these disclosures, AeroVironment continued to minimize the threat to its SCAR agreement and to overstate the likelihood that the Company would continue receiving substantial revenues from the program. On March 2, 2026, Defendant McDonnell participated in a fireside chat at the Citizens Technology Conference, during which he was questioned about the SCAR program and the Space News report published earlier that day.

52.     McDonnell stated that "we have a fixed price and a set delivery schedule and all the things that comes with that, and that's the process we're in now of negotiating that go-forward contract." He further represented: "We didn't cancel the contract. We're still on the program. We still have a contract."

53.     In direct response to the disclosure that the Space Force was soliciting proposals from competing vendors, McDonnell assured investors that "we're multiple years ahead of any particular competitors in the market." McDonnell further characterized the situation as "a little bit of a game of them trying to make us go faster, I think."

54.     On March 3, 2026, AeroVironment issued a press release stating that the Company "remain[s] in active negotiations" concerning the SCAR program. The Company further represented that "the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline." AeroVironment additionally assured investors that "AV is confident in its ability to successfully deliver our systems ahead of competitors."

55.     These statements were materially false and misleading because they failed to disclose that AeroVironment's negotiations with the U.S. Government were deteriorating and that

there was a substantial likelihood that the Government would terminate the Company's existing agreement to provide BADGER systems and open the SCAR program to competing vendors.

56.     On March 10, 2026, after the close of trading, AeroVironment filed a Current Report on Form 8-K announcing its financial results for the third quarter of fiscal year 2026. In that filing, the Company disclosed that the U.S. Government had "informed the Company that it now intends to proceed with a termination for convenience of the Agreement, while providing the Company with the opportunity to compete for work under the SCAR program in the future."

57.     AeroVironment also reported a net operating loss of approximately $179 million for the quarter, which was driven by a $151.3 million goodwill impairment charge recorded against the Company's Space reporting unit. The Company attributed the impairment charge to the SCAR stop-work order it had received in January 2026. Following these disclosures, the price of AeroVironment common stock declined by $13.84 per share, or approximately 6%, falling from a closing price of $221.57 per share on March 10, 2026, to $207.73 per share on March 11, 2026.

58.     Following these disclosures, Defendants continued to make misleading representations concerning both the status of the SCAR program and the reliability of the Company's goodwill impairment analysis. During AeroVironment's March 10, 2026, earnings call, Nawabi acknowledged that "we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work." He further stated that "the U.S. Space Force has concluded to terminate our existing contract for convenience . . . and enable AV to recompete for the program."

59.     Nawabi nevertheless continued to reassure investors that AeroVironment "remain[s] in active discussions with the U.S. Space Force" concerning the program and that "we

remain fully committed to delivering this innovative capability to the market while aligning to our customers' needs."

60.   During the same earnings call, McDonnell stated that the goodwill impairment analysis "was triggered by the SCAR stop work order," but represented that "[w]e do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience." McDonnell also acknowledged that AeroVironment expected to adjust its approximately $3 billion in unfunded backlog because "approximately $1.5 billion of the unfunded backlog relates to the SCAR program."

61.   On March 11, 2026, AeroVironment filed its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2026. The Form 10-Q reported a goodwill impairment charge of $151.3 million and stated that the Company's goodwill balance as of January 31, 2026, was approximately $2.46 billion.

62.   The Form 10-Q also represented that "our Chief Executive Officer and Chief Financial Officer concluded that, as of January 31, 2026, the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective and were operating at a reasonable assurance level."

63.   These statements were materially false and misleading because AeroVironment had materially understated the goodwill impairment charge attributable to its Space reporting unit and because the Company's disclosure controls and procedures were materially deficient.

64.   On June 22, 2026, AeroVironment filed a Current Report on Form 8-K announcing that the financial statements included in its March 11, 2026, Form 10-Q "require restatement and should no longer be relied upon." The Company disclosed that its goodwill impairment charge had

14

been understated by $89.4 million, increasing the corrected impairment charge from $151.3 million to $240.7 million.

65.    AeroVironment attributed the understatement to "an error in the calculation of the carrying value used in the goodwill impairment analysis of the Space reporting unit." The Company further disclosed that "the error and the related restatements were the result of a newly identified material weakness in the Company's internal control over financial reporting," and acknowledged that "the disclosure controls and procedures as of January 31, 2026, were ineffective."

66.    Following these disclosures, the price of AeroVironment common stock declined by $18.28 per share, or approximately 11%, falling from a closing price of $169.61 per share on June 18, 2026, to $151.33 per share on June 22, 2026.

### D.    Defendants' Insider Trading

67.    During the Relevant Time Period, the Defendants knew that the statements made about the SCAR contract with the U.S. DoD were materially false and misleading. Armed with this knowledge, Defendants Nawabi, McDonnell, and Page embarked on an insider selling spree. For example, on July 16, 2025, Defendant Nawabi sold 17,300 shares of Company common stock for proceeds of over $4.5 million. Defendant McDonnell sold $1.4 million worth of stock between October 10, 2025, and March 10, 2026. Defendant Page sold $835,477 in Company common stock between January 15, 2026, and June 15, 2026. All told, Defendants Nawabi, McDonnell, and Page sold over $6.7 million worth of stock during the Relevant Time Period, when they had access to information showing that the SCAR contract was at risk from competition, and the public did not.

15

**E.    Defendants' Misconduct Has and Continues to Harm the Company**

68.    As a direct and proximate result of Defendants' conduct, AeroVironment has incurred and will continue to incur substantial harm, including costs associated with the restatement of its financial statements, additional audit and accounting work, investigation and remediation of the material weakness in internal control over financial reporting, defense of the Securities Class Actions, advancement or indemnification obligations, and the diversion of management and Board resources.

69.    AeroVironment's reputation and goodwill have also been damaged, including its credibility with investors, regulators, customers, and other stakeholders.

**F.    AeroVironment Issues False and Misleading Proxy Statements**

70.    In addition to the false and misleading statements discussed above, the Director Defendants caused the Company to issue a materially false and misleading Schedule 14A Proxy Statement filed on August 13, 2025, in connection with AeroVironment's September 25, 2025, Annual Meeting of Stockholders (the "2025 Proxy"). The 2025 Proxy solicited stockholder votes to reelect Defendants Muller and Burbage and to elect Defendants Wodlinger and Albers to the Board.

71.    The Director Defendants drafted, approved, reviewed, authorized, and/or caused the 2025 Proxy to be filed with the SEC and disseminated to AeroVironment's stockholders. The Section 14(a) allegations concerning the 2025 Proxy are based solely on negligence and do not allege or sound in fraud. Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness with respect to the Section 14(a) claim.

16

72.    In support of the election or reelection of Defendants Muller, Burbage, Wodlinger, and Albers, the 2025 Proxy emphasized their purported qualifications to oversee the Company's business and provide strategic guidance to management. The 2025 Proxy further represented that:

> Our board of directors is responsible for overseeing our risk management and delegates many of these functions to the Audit and Cybersecurity Committees, which report regularly to the board. Under its charter, the Audit Committee is responsible for discussing with management the company's policies with respect to risk assessment and risk management. The committee is chartered to discuss with management our significant risk exposures and the actions management has taken to limit, monitor or control such exposures. Under its charter, the Cybersecurity Committee is responsible for reviewing, discussing, and making recommendations to the full board of directors regarding cybersecurity matters, including cyber risks. In addition to the Audit and Cybersecurity Committees' work in overseeing risk management, our full board engages in discussions of the most significant risks that we face and how these risks are being managed. Our Compensation and Nominating and Corporate Governance Committees are also involved in evaluating risks that fall within the purview of those committees' responsibilities.

73.    The 2025 Proxy thus assured stockholders that the Board understood Company-wide risks, actively oversaw the Company's risks and exposures, and monitored the steps taken to mitigate those risks. In reality, the Director Defendants failed to ensure that the Company maintained adequate internal controls and permitted materially false and misleading statements concerning: (a) the security and status of the SCAR agreement; (b) the anticipated revenues and margins from BADGER production; (c) the threat of termination and competition from other vendors; (d) the resulting goodwill impairment; and (e) the effectiveness of the Company's disclosure controls and procedures.

74.    As a result of these materially misleading statements, AeroVironment's stockholders voted without complete and accurate information to reelect Defendants Muller and Burbage and to elect Defendants Wodlinger and Albers to the Board.

### G.    The Board Breached its Fiduciary Duties

75.    As officers and/or directors of AeroVironment, the Defendants owed AeroVironment fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage AeroVironment in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of AeroVironment, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

76.    Defendants, because of their positions of control and authority as directors and/or officers of AeroVironment, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding AeroVironment's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

77.    To discharge their duties, the officers and directors of AeroVironment were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and AeroVironment were required to, among other things:

    (a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

18

disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)     Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

78.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

79.     The Board's Audit Committee is tasked with overseeing AeroVironment's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of AeroVironment's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- "Discuss[ing] with management its process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act";
- Reviewing management's annual assessment of the effectiveness of the Company's internal control over financial reporting and the independent auditor's related report;
- Discussing with management and the independent auditor any material weaknesses or significant deficiencies in the Company's internal controls;
- Reviewing management's plans to remediate identified control deficiencies;
- Determining whether the Company's disclosures concerning material weaknesses and remediation efforts are clear and complete;
- Discussing management's process for completing the quarterly certifications required by Section 302 of the Sarbanes-Oxley Act, including the Chief Executive Officer's and Chief Financial Officer's evaluation of the effectiveness of the Company's disclosure controls; and
- Reviewing changes in internal control over financial reporting that materially affected, or were reasonably likely to materially affect, the Company's internal controls and were required to be disclosed in the Company's SEC filings.

80. In violation of the Audit Committee Charter and their general duties as members of the Audit Committee, Defendants Muller, Page, Lewis, and Davidson—with Defendant Muller serving as Chair—conducted little, if any, meaningful oversight of the Company's internal control over financial reporting. Their conscious disregard of their duties permitted materially false and misleading financial and control disclosures and resulted in harm to the Company and its stockholders.

81. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

82. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on AeroVironment.

## **DERIVATIVE ALLEGATIONS**

83. Plaintiff brings this action derivatively in the right and for the benefit of AeroVironment to redress injuries suffered by AeroVironment as a direct result of the Director Defendants' breaches of fiduciary duty. AeroVironment is named as a nominal defendant solely

in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

84.    Plaintiff will adequately and fairly represent the interests of AeroVironment in enforcing and prosecuting the Company's rights.

85.    Plaintiff was a stockholder of AeroVironment at the time of the wrongdoing complained of, has continuously remained a stockholder since that time, and is currently an AeroVironment stockholder.

## DEMAND FUTILITY ALLEGATIONS

86.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

87.    At the time this action is commenced, AeroVironment's Board consists of nine directors: Nawabi, Muller, Burbage, Page, Lewis, Davidson, Long, Votel, and William J. Lynn III.

88.    As alleged below, at least five of the nine directors on the demand Board—Nawabi, Muller, Page, Lewis, and Davidson—could not impartially consider a demand because Nawabi lacks independence and faces a substantial likelihood of liability for his direct participation in the alleged misconduct, while Muller, Page, Lewis, and Davidson face a substantial likelihood of liability arising from their Audit Committee responsibilities and alleged conscious disregard of material financial-reporting and internal-control red flags.

89.    Plaintiff has not made a demand on AeroVironment's current Board to institute this action because any such demand would be futile and is excused. The current Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

90.    The Director Defendants had a duty to ensure that AeroVironment's SEC filings, press releases, earnings calls, investor presentations, and other public statements concerning its

22

business, operations, prospects, financial statements, goodwill, internal control over financial reporting, and disclosure controls and procedures were accurate. The Director Defendants were also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively.

91.    The Director Defendants' making, authorization, or knowing acquiescence in the false and misleading statements discussed above caused the Company's common stock to trade at artificially inflated prices and misrepresented AeroVironment's business and financial condition. Their failure to timely correct those statements, adequately monitor the Company's financial-reporting processes, respond to material red flags, and ensure that the Board's duties were discharged in good faith constitutes breaches of fiduciary duty that expose the responsible Director Defendants to a substantial likelihood of liability.

## A. Demand Is Excused as to Defendant Nawabi

92.    Defendant Nawabi is AeroVironment's Chairman, President, and Chief Executive Officer. According to the 2025 Proxy, Nawabi received a salary of $879,071 and total compensation of $7,405,129 for fiscal year 2025. Nawabi depends upon AeroVironment for his employment and income. The 2025 Proxy further stated that Nawabi was the only member of the Board who did not qualify as independent under the applicable Nasdaq listing standards and SEC rules.

93.    Defendant Nawabi served as a director throughout the relevant time period. As a director, Nawabi had a duty to ensure that the Company's SEC filings, press releases, earnings calls, investor presentations, and other public statements concerning its business, operations, prospects, internal controls, and financial statements were accurate. Nawabi was also required to

23

act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective.

94.    Nawabi failed to conduct adequate oversight of the Company's financial reporting, goodwill-impairment analysis, internal control over financial reporting, disclosure controls and procedures, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls and financial reporting, Nawabi failed to protect the Company's assets.

95.    Nawabi was an active participant in the misconduct described above. Among other things, Nawabi personally represented that AeroVironment had "won" the SCAR contract, that the program was a significant growth opportunity, and that the Company was "very much on track" to increase revenues and margins from BADGER production. Nawabi continued to provide assurances regarding the SCAR program despite the stop-work order, threatened competition, and deterioration of the Company's negotiations with the U.S. Government.

96.    Nawabi also participated in and certified the Company's March 11, 2026 Form 10-Q, which understated the goodwill impairment associated with the Space reporting unit by $89.4 million and represented that AeroVironment's disclosure controls and procedures were effective as of January 31, 2026. The Company subsequently admitted that those financial statements required restatement and that its disclosure controls and procedures were ineffective.

97.    In addition, Defendant Nawabi sold more than $4.5 million of Company common stock during the Relevant Time Period, while in possession of material nonpublic information.

24

98.     Nawabi is a named defendant in the Securities Class Action. Nawabi therefore faces a substantial likelihood of liability for his direct participation in the misconduct, making demand upon him futile.

**B. Demand Is Excused as to Defendant Muller**

99.     Defendant Muller served as a director of the Company throughout the relevant time period. As a director, Muller had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Muller was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective.

100.    Muller failed to conduct adequate oversight of the Company's internal control over financial reporting, goodwill-impairment analysis, disclosure controls and procedures, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls, Muller failed to protect the Company's assets.

101.    According to the 2025 Proxy, Muller received $266,860 in compensation in connection with his service as an AeroVironment director during fiscal year 2025, consisting of $107,000 in cash fees and stock awards valued at $159,860.

102.    Muller was also one of the directors whose reelection was solicited through the 2025 Proxy. The 2025 Proxy represented that Muller and the other nominees possessed the qualifications necessary to provide effective oversight of AeroVironment's business and strategic

advice and counsel to management. Muller reviewed, approved, authorized, and/or permitted the issuance of the materially misleading 2025 Proxy soliciting his own reelection.

103. Muller served as Lead Independent Director, Chair of the Audit Committee, and an audit committee financial expert throughout the relevant time period. The Audit Committee was responsible for overseeing the Company's financial accounting and reporting, systems of internal control, audit process, quarterly financial statements, significant accounting estimates, and disclosure controls and procedures.

104. The Audit Committee was therefore responsible for reviewing the financial statements included in AeroVironment's March 11, 2026, Form 10-Q and monitoring the adequacy and effectiveness of the Company's internal controls. As Audit Committee Chair, Muller knowingly or recklessly permitted the Company to issue materially false and misleading statements concerning the amount of the goodwill impairment and the effectiveness of AeroVironment's disclosure controls and procedures.

105. Muller knowingly or recklessly disregarded material red flags, including the SCAR stop-work order, the Government's decision to solicit competing vendors, the deterioration and termination of the existing SCAR agreement, and the resulting impairment indicators affecting the Space reporting unit. Through his failure to adequately monitor management, the internal audit function, and the independent registered public accounting firm, Muller allowed the misconduct described above to occur.

106. Accordingly, Muller breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Muller futile.

**C. Demand Is Excused as to Defendant Page**

107.    Defendant Page served as a director of the Company throughout the relevant time period. As a director, Page had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Page was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective.

108.    Page failed to conduct adequate oversight of the Company's internal control over financial reporting, goodwill-impairment analysis, disclosure controls and procedures, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls, Page failed to protect the Company's assets.

109.    According to the 2025 Proxy, Page received $239,860 in compensation in connection with his service as an AeroVironment director during fiscal year 2025, consisting of $80,000 in cash fees and stock awards valued at $159,860.

110.    Page served on the Audit Committee and was designated an audit committee financial expert throughout the relevant time period. The Audit Committee was responsible for reviewing AeroVironment's quarterly financial statements, significant accounting estimates, goodwill-impairment analysis, internal control over financial reporting, and disclosure controls and procedures.

111.    The Audit Committee was therefore responsible for reviewing the financial statements included in AeroVironment's March 11, 2026, Form 10-Q and monitoring the adequacy

and effectiveness of the Company's internal controls. Page knowingly or recklessly permitted the Company to understate its goodwill impairment by $89.4 million and to represent that its disclosure controls and procedures were effective.

112. Page knowingly or recklessly disregarded material red flags arising from the stop-work order, threatened competition, termination of the SCAR agreement, and resulting impairment indicators. Through his failure to adequately monitor management, the internal audit function, and the independent registered public accounting firm, Page allowed the misconduct described above to occur.

113. In addition, Defendant Page sold $835,477 of Company common stock during the Relevant Time Period, while in possession of material nonpublic information.

114. Accordingly, Page breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Page futile.

**D. Demand Is Excused as to Defendant Lewis**

115. Defendant Lewis served as a director of the Company throughout the relevant time period. As a director, Lewis had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Lewis was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective.

116. Lewis failed to conduct adequate oversight of the Company's internal control over financial reporting, goodwill-impairment analysis, disclosure controls and procedures, and

statements to regulators, investors, and the public. By consciously disregarding her duty to monitor AeroVironment's controls, Lewis failed to protect the Company's assets.

117.    According to the 2025 Proxy, Lewis received $247,360 in compensation in connection with her service as an AeroVironment director during fiscal year 2025, consisting of $87,500 in cash fees and stock awards valued at $159,860.

118.    Lewis served on the Audit Committee and was designated an audit committee financial expert throughout the relevant time period. The Audit Committee was responsible for reviewing AeroVironment's quarterly financial statements, significant accounting estimates, goodwill-impairment analysis, internal control over financial reporting, and disclosure controls and procedures.

119.    The Audit Committee was therefore responsible for reviewing the financial statements included in AeroVironment's March 11, 2026, Form 10-Q and monitoring the adequacy and effectiveness of the Company's internal controls. Lewis knowingly or recklessly permitted the Company to understate its goodwill impairment by $89.4 million and to represent that its disclosure controls and procedures were effective.

120.    Lewis knowingly or recklessly disregarded material red flags arising from the stop-work order, threatened competition, termination of the SCAR agreement, and resulting impairment indicators. Through her failure to adequately monitor management, the internal audit function, and the independent registered public accounting firm, Lewis allowed the misconduct described above to occur.

121.    Accordingly, Lewis breached her fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Lewis futile.

**E. Demand Is Excused as to Defendant Davidson**

122.    Defendant Davidson served as a director of the Company throughout the relevant time period. As a director, Davidson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Davidson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective.

123.    Davidson failed to conduct adequate oversight of the Company's internal control over financial reporting, goodwill-impairment analysis, disclosure controls and procedures, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls, Davidson failed to protect the Company's assets.

124.    According to the 2025 Proxy, Davidson received $236,860 in compensation in connection with his service as an AeroVironment director during fiscal year 2025, consisting of $77,000 in cash fees and stock awards valued at $159,860.

125.    Davidson served on the Audit Committee throughout the relevant time period. The Audit Committee was responsible for reviewing AeroVironment's quarterly financial statements, significant accounting estimates, goodwill-impairment analysis, internal control over financial reporting, and disclosure controls and procedures.

126.    The Audit Committee was therefore responsible for reviewing the financial statements included in AeroVironment's March 11, 2026, Form 10-Q and monitoring the adequacy and effectiveness of the Company's internal controls. Davidson knowingly or recklessly permitted the Company to understate its goodwill impairment by $89.4 million and to represent that its disclosure controls and procedures were effective.

127.    Davidson knowingly or recklessly disregarded material red flags arising from the stop-work order, threatened competition, termination of the SCAR agreement, and resulting impairment indicators. Through his failure to adequately monitor management, the internal audit function, and the independent registered public accounting firm, Davidson allowed the misconduct described above to occur.

128.    Accordingly, Davidson breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Davidson futile.

**F. Demand Is Excused as to Defendant Burbage**

129.    Defendant Burbage served as a director of the Company throughout the relevant time period. As a director, Burbage had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Burbage was also required to act in good faith and with due diligence to ensure that the Company's internal controls and risk-management processes were sufficiently robust and effective.

130.    Burbage failed to conduct adequate oversight of the Company's operations, risk-management processes, internal controls, and statements to regulators, investors, and the public.

31

By consciously disregarding his duty to monitor AeroVironment's controls and material business risks, Burbage failed to protect the Company's assets.

131. According to the 2025 Proxy, Burbage received $239,860 in compensation in connection with his service as an AeroVironment director during fiscal year 2025, consisting of $80,000 in cash fees and stock awards valued at $159,860.

132. Burbage was one of the directors whose reelection was solicited through the 2025 Proxy. The 2025 Proxy represented that Burbage and the other nominees possessed the qualifications necessary to provide effective oversight of AeroVironment's business and strategic advice and counsel to management. Burbage reviewed, approved, authorized, and/or permitted the issuance of the materially misleading 2025 Proxy soliciting his own reelection.

133. Burbage also served as a member of the Executive Committee, which was authorized to exercise the powers of the Board when the full Board was not in session. Despite the significance of SCAR to AeroVironment's acquisition of BlueHalo and future growth projections, Burbage knowingly or recklessly permitted the Company to continue issuing misleading statements concerning the security of the SCAR agreement, the threat of competing vendors, and the revenues and margins expected from BADGER production.

134. Accordingly, Burbage breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Burbage futile.

**G. Demand Is Excused as to Defendant Long**

135. Defendant Long served as a director of the Company throughout the relevant time period. As a director, Long had a duty to ensure that the Company's SEC filings, press releases,

32

and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Long was also required to act in good faith and with due diligence to ensure that the Company's internal controls and risk-management processes were sufficiently robust and effective.

136. Long failed to conduct adequate oversight of the Company's business risks, internal controls, and statements to regulators, investors, and the public. By consciously disregarding her duty to monitor AeroVironment's controls and material business risks, Long failed to protect the Company's assets.

137. According to the 2025 Proxy, Long received $232,860 in compensation in connection with her service as an AeroVironment director during fiscal year 2025, consisting of $73,000 in cash fees and stock awards valued at $159,860.

138. Long served as a member of the Nominating and Corporate Governance Committee. The 2025 Proxy represented that the full Board was responsible for overseeing the Company's risk management, understanding the most significant risks confronting AeroVironment, and monitoring management's response to those risks.

139. Despite the significance of SCAR to the BlueHalo acquisition and AeroVironment's growth projections, Long knowingly or recklessly permitted the Company to continue issuing misleading statements concerning the security of the SCAR agreement, the threat of competing vendors, and the revenues and margins expected from BADGER production. Long further failed to take appropriate corrective action after the Government issued the stop-work order and disclosed its intention to introduce competing vendors and terminate the existing agreement.

140. Accordingly, Long breached her fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Long futile.

## H. Demand Is Excused as to Defendant Votel

141. Defendant Votel served as a director of the Company throughout the relevant time period. As a director, Votel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Votel was also required to act in good faith and with due diligence to ensure that the Company's internal controls and risk-management processes were sufficiently robust and effective.

142. Votel failed to conduct adequate oversight of the Company's business risks, internal controls, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls and material business risks, Votel failed to protect the Company's assets.

143. According to the 2025 Proxy, Votel received $226,860 in compensation in connection with his service as an AeroVironment director during fiscal year 2025, consisting of $67,000 in cash fees and stock awards valued at $159,860.

144. AeroVironment specifically identified Votel's extensive military and national-security experience as a qualification for Board service. Votel was therefore particularly positioned to appreciate the significance of the Government's stop-work order, its decision to introduce competing vendors, and the deterioration and termination of the SCAR agreement.

34

145.    Despite his specialized experience, Votel knowingly or recklessly permitted AeroVironment to continue issuing misleading statements concerning the security of the SCAR agreement, the competitive position of BADGER, and the revenues and margins expected from the program. Votel further failed to take appropriate corrective action after the Government's adverse position became public.

146.    Accordingly, Votel breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability for those breaches, making demand upon Votel futile.

## ADDITIONAL ALLEGATIONS CONCERNING FORMER DIRECTORS

### A. Allegations Concerning Former Director Wodlinger

147.    Defendant Wodlinger served as an AeroVironment director from May 1, 2025, through June 17, 2026. As a director, Wodlinger had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

148.    Wodlinger failed to conduct adequate oversight of the Company's business risks, internal controls, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls and material business risks, Wodlinger failed to protect the Company's assets.

149.    The 2025 Proxy did not disclose fiscal year 2025 director compensation for Wodlinger because he was appointed to the Board effective May 1, 2025, after the conclusion of that fiscal year. His actual fiscal year 2026 director compensation has not yet been disclosed in a definitive proxy statement.

150. Wodlinger formerly served as Chair of BlueHalo and participated in Arlington Capital Partners' investment in and oversight of BlueHalo. He therefore possessed specialized knowledge concerning BlueHalo's business, the importance of the SCAR program to the acquisition, and the status and risks associated with the BADGER agreement.

151. Wodlinger was one of the directors whose election was solicited through the 2025 Proxy. The Proxy represented that Wodlinger possessed the qualifications necessary to provide effective oversight of AeroVironment's business. Wodlinger reviewed, approved, authorized, and/or permitted the issuance of the materially misleading 2025 Proxy soliciting his own election.

152. Despite his specialized knowledge, Wodlinger knowingly or recklessly permitted AeroVironment to issue materially misleading statements concerning the security and value of the SCAR program, the threat of competing vendors, and the revenues and margins expected from BADGER production.

153. Accordingly, Wodlinger breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability. Because Wodlinger resigned from the Board before this action was filed, however, he is not a member of the current demand Board and is not counted in determining whether a majority of that Board could impartially consider a demand.

## B. Allegations Concerning Former Director Albers

154. Defendant Albers served as an AeroVironment director from May 1, 2025, through June 17, 2026. As a director, Albers had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

155.    Albers failed to conduct adequate oversight of the Company's business risks, internal controls, and statements to regulators, investors, and the public. By consciously disregarding his duty to monitor AeroVironment's controls and material business risks, Albers failed to protect the Company's assets.

156.    The 2025 Proxy did not disclose fiscal year 2025 director compensation for Albers because he was appointed to the Board effective May 1, 2025, after the conclusion of that fiscal year. His actual fiscal year 2026 director compensation has not yet been disclosed in a definitive proxy statement.

157.    Albers formerly served as a director of BlueHalo and participated in Arlington Capital Partners' investment in and oversight of BlueHalo. He therefore possessed specialized knowledge concerning BlueHalo's business, the importance of the SCAR program to the acquisition, and the status and risks associated with the BADGER agreement.

158.    Albers was one of the directors whose election was solicited through the 2025 Proxy. The Proxy represented that Albers possessed the qualifications necessary to provide effective oversight of AeroVironment's business. Albers reviewed, approved, authorized, and/or permitted the issuance of the materially misleading 2025 Proxy soliciting his own election.

159.    Despite his specialized knowledge, Albers knowingly or recklessly permitted AeroVironment to issue materially misleading statements concerning the security and value of the SCAR program, the threat of competing vendors, and the revenues and margins expected from BADGER production.

160.     Accordingly, Albers breached his fiduciary duties of loyalty and good faith and faces a substantial likelihood of liability. Because Albers resigned from the Board before this action was filed, however, he is not a member of the current demand Board and is not counted in determining whether a majority of that Board could impartially consider a demand.

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Fiduciary Duty**
**(Derivatively Against the Director Defendants)**

161.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

162.     Each of the Director Defendants owed and owes AeroVironment fiduciary duties of loyalty, good faith, due care, candor, and oversight.

163.     Each of the Director Defendants violated and breached the fiduciary duties owed to the Company.

164.     The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

165.     In addition, the Director Defendants further breached their fiduciary duties owed to AeroVironment by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose (a) the security and status of the SCAR contract; (b) the anticipated revenues and margins from BADGER production; (c) the threat of termination and competition from other vendors; (d) the resulting

38

goodwill impairment; and (e) the effectiveness of the Company's disclosure controls and procedures.. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

166.    The Director Defendants had actual or constructive knowledge of the wrongdoing alleged herein and of the Company's deficient internal controls or acted with reckless disregard for facts available to them. Had the Director Defendants acted in good faith, they would have taken appropriate action to investigate, correct, and prevent the misconduct and resulting harm.

167.    As a direct and proximate result of the breaches of duty alleged herein, AeroVironment has sustained and will sustain significant damages.

168.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

169.    Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty
## (Derivatively Against the Officer Defendants)

170.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

171.    The Officer Defendants served or currently serve as executive officers of the Company. In those capacities, the Officer Defendants owed and owe AeroVironment fiduciary duties of loyalty, good faith, due care, oversight, and candor.

172.    The Officer Defendants breached their fiduciary duties owed to AeroVironment by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose (a) the security and status of the

39

SCAR contract; (b) the anticipated revenues and margins from BADGER production; (c) the threat of termination and competition from other vendors; (d) the resulting goodwill impairment; and (e) the effectiveness of the Company's disclosure controls and procedures. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

173. As a direct and proximate result of the breaches of duty alleged herein, AeroVironment has sustained and will sustain significant damages.

174. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

175. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

**COUNT III**
**Violation of Section 14(a) of the Exchange Act**
**(Against the Director Defendants)**

176. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

177. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

178. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements contained in the 2025 Proxy. Through the 2025 Proxy, the Board solicited stockholder votes to reelect Defendants Muller and Burbage and to elect Defendants Wodlinger and Albers to the Board.

40

179.    The 2025 Proxy misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls. Plaintiff alleges that the 2025 Proxy was an essential link in the stockholder votes electing or reelecting Defendants Muller, Burbage, Wodlinger, and Albers. By reason of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9.

180.    Plaintiff, on behalf of AeroVironment, seeks relief for corporate harm proximately caused by the materially misleading 2025 Proxy in connection with the election or reelection of Defendants Muller, Burbage, Wodlinger, and Albers.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of AeroVironment and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of AeroVironment for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding AeroVironment all equitable and restitutionary relief available under the causes of action pleaded herein;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

**SUTTER & TERPAK, PLLC**

*/s/*_____
Matthew T. Sutter, VSB 66741
7540 Little River Turnpike, Suite A
Annandale, Virginia 22003
Telephone: (703) 256-1800
Facsimile: (703) 991-6116
Email: matt@sutterandterpak.com

*Local Counsel for Plaintiff*

**BRIAN MURRAY LAW PLLC**
Brian P. Murray, Esq.*
750 E. Main St., Suite 620
Stamford, CT 06902
Telephone: (203) 246-2368
Email: bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq.*
Danielle Rowland Lindahl, Esq.*
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email:  srowley@rowleylawpllc.com
         drl@rowleylawpllc.com

* to be admitted *pro hac vice*

*Counsel for Plaintiff*

42